UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Criminal No. 1:21-cr-10084-RGS |
| | ) | |
| ISHTIAQ SAAEM | ) | |

## DEFENDANT'S MEMORANDUM ON THE APPROPRIATE SENTENCE UNDER 18 U.S.C. §§ 3553 AND 3661

Defendant, Ishtiaq Saaem ("Saaem"), by and through his counsel, hereby submits his Sentencing Memorandum for the Court's consideration and requests a sentence, calculated and reviewed pursuant to 18 U.S.C. §§ 3553 and 3661, that is sufficient but not greater than necessary to achieve the statutory goals of sentencing.

For the reasons stated below, Saaem submits a sentence of 6 months home confinement followed by 1 year of probation with community confinement, which is sufficient but not greater than necessary to achieve the statutory goals of sentencing.

ISHTIAQ SAAEM,
By his counsel

/s/ Derege B. Demissie
DEREGE B. DEMISSIE
DEMISSIE & CHURCH
929 Massachusetts Ave., Suite 101
Cambridge, MA 02139
Ph: (617) 354-3944
Fax: (617) 868-2520
dd@demissiechurch.com

Dated: March 28, 2022

1

## TABLE OF CONTENTS

A.     Procedural Sentencing Framework                                    3

B.     Statement of Facts                                                  4

C.     The Kinds of Sentences Available                                    6

1.  Request for Downward Departure for Loss of Caretaker
    and Financial Support

2.  A Sentence of Home Confinement Followed by a Term of Probation with
    Community Attachment is More Appropriate than a Sentence that
    Incudes Imprisonment                                                   9

D.     Application of the 18 U.S.C. § 3553(a) Sentencing Factors          12

1.  History and Characteristics of Ishtiaq Saeem                         12
            a.   Childhood and Family Life                                12
            b.   Education                                                14
            c.   Personal Life                                           16

2.  The Need for a Sentence to Reflect the Seriousness of the Offense, Promote Respect for
    the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public
    from Further Crimes                                                   18

3.  The Need to Avoid Unwarranted Disparities                            21

4.  The Need to Provide Restitution to any Victims of the Offense        22

E.     Other Factors                                                     22
        1.   Saeem has Already Suffered Significant and Unique Harm       22
        2.   Incarceration is More Significant for a "First Offender" than Upon a Repeat
             Offender                                                    23

F.     Conclusion                                                        24

### A.  PROCEDURAL SENTENCING FRAMEWORK

In arriving at a fair and just sentence, the court is required to consider the statutory factors under 18 U.S.C. § 3553(a).  Although the sentencing guideline is one of the factors, recent United States Supreme Court decisions have made it clear that the Court need not follow it nor give it more weight than the other factors.  The Court is only required to give "some weight" to the advisory guidelines, as it would to the other 18 U.S.C. § 3553(a) factors.  *Gall v. United States,* 552 U.S. –, 2007 WL 4292116 (Dec. 10, 2007)*.*  In *Gall*, the Supreme Court "reject[ed] an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range."  The Court also "reject[ed] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence."  The Court made it clear that any attempt to give special weight to the sentencing guideline is contrary to its holding in *Booker,* which means the guidelines are advisory.  See also, *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). Both cases, decided the same day, make it clear that district courts are only required to give "some weight" to the advisory guidelines, as they are to the other 18 U.S.C. § 3553(a) factors.

An analysis of each of the factors enumerated in 18 U.S.C. § 3553(a), including the specific offence conduct, Saaem's background and history, the need for deterrence, the prospect of recidivism, the impact on innocent third parties, and the direction of Congress to avoid sentencing disparities with similarly situated defendants, supports the recommended sentence. The sentence would best achieve the objectives listed in 18 U.S.C. § 3553(a)(2), as it would reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. Such a sentence would also satisfy 18 U.S.C. § 3553(a)'s

3

parsimony clause, which requires that the sentence be "sufficient but not greater than necessary" to accomplish the stated goals of sentencing.

## B.    STATEMENT OF FACTS

Saaem pled guilty to one count of Information charging him with Obstruction of Justice in violation of 18 U.S.C. § 1512(c)(2)

The underlying conduct, other than the false statements about the conduct itself, took place in the Summer of 2015. On or about July 2, 2015, special agents from the Federal Bureau of Investigation ("FBI") interviewed Saaem about a purchase order he placed the previous week for castor beans. *See* Statement of Facts Attached to the Plea Agreement ("Stmt. Facts"). At the time, he had not received the order. Saaem told law enforcement agents that he purchased castor beans solely for the purpose of planting them for decoration. He did not mention any interest in experimenting with seeds to create poison. Saaem amended the order and received about 6 castor beans.

In July and August 2015, Saaem searched the internet for topics related to poison and visited "a webpage about extracting cyanide, another deadly poison, from apple seeds." Stmt. Facts. He "later visited webpages containing articles entitled, 'What is the most lethal poison?', '[t]he five deadly poisons that can be cooked up in a kitchen,' and conducted internet searches for "tasteless poison household item," rat poison, and extracting poison from tomato plants." See Stmt. Facts Attached to plea agreement.

In 2019, while investigating a matter related to the company Saaem worked for, the FBI came across a confidential document which set forth repayment of reimbursements Saaem made to

the company. On or about July 29, 2019, Saaem spoke with FBI agents who appeared at his home in the early morning hours. Saaem was asked about the payment he made to the company.

Following the visit, on August 22, 2019, the agents contacted Saaem and informed him he is summonsed to testify before the grand jury. His understanding was that the government was investigating the company relative to an unrelated matter and his testimony was necessary to clarify the nature and circumstances of the repayment agreement.

On or about January 31, 2020, Saaem, represented by counsel, voluntarily met with law enforcement and made a proffer in lieu of a grand jury appearance. At the proffer, Saaem admitted, without being pressed, that, in 2019, he lied to the FBI about the confidential agreement he entered with the company. He explained that he had been woken up early in the morning by the agents who questioned him and that he had responded without being fully open and forthcoming and with the hope of avoiding potential consequences.

He was then further questioned about his acquisition of castor beans in 2015. Saaem falsely stated that his purpose in buying castor beans related solely out of an interest in gardening. In fact, however, around the time of he purchased the castor beans, Saaem was watching a popular television series, Breaking Bad, in which the main character, a chemist, makes poison from plants. Saaem was curious, as a scientist himself, about experimenting with castor beans. However, he was afraid to tell the FBI about this curiosity. At the time he made the statements to law enforcement, Saaem "knew that his purposes in buying castor beans and lily of the valley *included* the acquisition of the sources of ricin and convallatoxin." See Stmt. Facts Attached to plea agreement.

5

Despite investigating Saaem in the Summer of 2015, and possibly watching him for the following 7 years, the government has not found any evidence that indicates Saaem has ever created, manufactured, or possessed ricin or any convallatoxin. There is absolutely no evidence whatsoever that he intended to cause any harm to any individual. The limited web searches he made in the Summer of 2015 constituted the totality of the evidence the government gathered in this case, other than the purchase of castor beans and his statements. Saaem voluntary, and without prompting, informed the government about the Plump Lily of the Valley Plants he ordered from Amazon.  He also informed the government, through his counsel, that he was watching the "Breaking Bad" episodes at the time. Additionally, it is noteworthy that Saaem took no action to hide or delete his web searches from detection.

Finally, Saaem accepted responsibility very early in the process, entered into a plea agreement that alleviated the need for indictment, and entered a plea to one count of information at the time of his initial appearance, allowing the government to conserve its resources.

## C.  THE KINDS OF SENTENCES AVAILABLE

The applicable guideline range based on the Total Adjusted Offense level 13 and Criminal History Category I is 12-18 months. The range falls under Zone C of the Sentencing Table. Saaem is statutorily eligible to receive a sentence of probation.

### 1.  Request for Downward Departure for Loss of Caretaker and Financial Support

The sentencing guidelines recognize loss of caretaker and/or financial support resulting from a defendant's incarceration as a factor that the court may consider in departing downward

6

under certain exceptional circumstances.  *See* U.S.S.G. § 5H1.6.  The Court can consider the attendant loss of caretaker and financial support in this case as grounds for departure from the guideline range.

Application Note 1(B) states, in addition to the non-exhaustive list of circumstances provided in subdivision (A), a departure based on loss of caretaker and financial support of the defendant's family requires the court's consideration of the presence of the following circumstances:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

> (iv) The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6, application note 1(B).

The Application Note for the above provision provides that "[I]n determining whether a departure is warranted under this policy statement, the court shall consider the following non-exhaustive list of circumstances:(i) The seriousness of the offense; (ii) The involvement in the

offense, if any, of members of the defendant's family; (iii) The danger, if any, to members of the defendant's family as a result of the offense."  U.S.S.G. § 5H1.6, application note 1(A).

In Saaem's case, his incarceration will "cause a substantial, direct, and specific loss of essential caretaking" as he is the primary caretaker for his son, who depends on his support to address unique and wide-ranging medical and developmental needs. Given the nature of his wife's work schedule and duties, including a requirement to be on-call periodically to respond to medical emergencies as they arise, his absence will leave a significant hole in the care and protection of his very young child. The child's medical needs and diagnoses as well as individualized education plan are filed as exhibits, under seal, in support of this memorandum. See Exhibit Group A.

In July of this year, Saaem and Nabila will welcome their second child. The joy of their expectation has, of course, been marred by the stress of anticipating the disposition of this case. The threat of losing Saaem's ability to care for their children looms over them. Nabila's pregnancy is high-risk due to the severely premature delivery of their son in her first pregnancy. That, in itself, is a strain, added to her full workload and the stress of awaiting the resolution of this case. Due to the high-risk nature of her pregnancy, Nabila's doctor has restricted her from any strenuous physical tasks, such as lifting. As you can imagine, that is not easy as the parent of a busy and needy toddler, which again, underscores the family's reliance on Saaem as the primary caregiver. Under the circumstances, the court has sufficient basis before it to sentence Saaem to serve a period of home confinement followed by a term of probation.

### 2. A Sentence of Home Confinement Followed by a Term of Probation with Community Attachment is More Appropriate than a Sentence that Incudes Imprisonment

The guideline in this case has failed properly to capture the offense conduct, reflect § 3553(a) considerations, or appropriately treat Saaem's characteristics. A variance sentence is appropriate. Rita v. United States, 127 S. Ct. 2456, 2465, 2468 (2007). Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," Kimbrough v. United States, 128 S. Ct. 558, 570 (2007) (internal quotation marks omitted). In the event a judge's determination so varies, the courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." Rita, 127 S. Ct. at 2463.

Whatever respect a guideline may deserve depends on whether the Commission acted in "the exercise of its characteristic institutional role." Kimbrough, 128 S. Ct. at 575. This role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision considering judicial decisions, sentencing data, and comments from participants and experts in the field. Rita, 127 S. Ct. at 2464-65. "Notably, not all of the Guidelines are tied to this empirical evidence." Gall v. United States, 128 S. Ct. 586, 594 n.2 (2007). When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion for a court to conclude that it fails to achieve the § 3553(a)'s purposes, even in "a mine-run case." Kimbrough, 128 S. Ct. at 575.

Although the guideline range falls under Zone C, it does so in the most technical sense. This case is more akin to the run-of-the-mill false statement cases which fall under Zones A or B.

9

The 2-level increase for possession of ricin, for example, is applicable only in the most

expansively charitable reading of the guideline provision. There is no evidence of actual

possession of ricin. Ricin was never manufactured or created. The provision was applicable only

insofar as the stipulated facts provided: Saaem was considering experimenting with extracting

ricin from castor beans when he obtained the seeds. Saaem should therefore not be punished in

the same way as someone who manufactured and possessed ricin. But for the 2-level

enhancement, the guideline range would have fallen under Zone B.

Additionally, the guidelines themselves acknowledge that "[p]robation may be used as an

alternative to incarceration, provided that the terms and conditions of probation can be fashioned

to meet fully the statutory purposes of sentencing, including promoting respect for law,

providing just punishment for the offense, achieving general deterrence, and protecting the

public from further crimes by the defendant." USSG Ch. 5, Part B intro. Comment.

They also recognize that there may be circumstances where community confinement is

preferable to a term of imprisonment even for offenders in Zone C. *See* USSG § 5C1.1, n.6

(noting cases where departure is warranted to accomplish a treatment purpose).  Even for

defendants who fall under criminal history categories above III, the guidelines only discourage

the use of substitutes for imprisonment for those defendants in cases where such defendants have

failed to reform despite the use of such alternatives. USSG § 5C1.1, n. *7*.

Statutory provisions, policy considerations, and the legislative history of 28 U.S.C. § 994,

all support a sentence of probation in this case. This Court can impose a term of probation for

guideline range in Zone C. Post-*Booker,* the guideline zone designations, like all other

guidelines, are advisory. While most offenders who receive alternative sentences are in Zones A

10

and B, nothing prohibits a court from imposing an alternative sentence for a defendant in Zone C

or D.

Significantly, two provisions of 28 U.S.C. § 994 required the Commission to consider

alternative sentencing options:

> 28 U.S.C. § 994(j) states: The Commission shall insure that the guidelines reflect
> the general appropriateness of imposing a sentence other than imprisonment in
> cases in which the defendant is a first offender who has not been convicted of a
> crime of violence or an otherwise serious offense . . ..

28 U.S.C. § 994(k) states:

> The Commission shall insure that the guidelines reflect the inappropriateness of
> imposing a sentence to a term of imprisonment for the purpose of rehabilitating
> the defendant or providing the defendant with needed educational or vocational
> training, medical care, or other correctional treatment.

In the legislative history of these provisions, Congress noted that if an offense does not

warrant imprisonment for some purpose of sentencing, the committee would expect that such a

defendant would be placed on probation. S. Rep. No. 98-225 at 171 n. 531 (1983); *see also id*. at

92 (Committee expects that in situations in which rehabilitation is the only appropriate purpose

of sentencing, that purpose ordinarily may be best served by release on probation subject to

certain conditions), *id*. (It may very often be that release on probation under conditions designed

to fit the particular situation will adequately satisfy any appropriate deterrent or punitive

purpose).

In Massachusetts, from 2016 to 2020, 47.7% of US-citizen, federal defendants in Zone C

were sentenced to "prison only," 18.8% were sentenced to "prison and alternatives," 14.1% were

sentenced to "probation and alternatives," and 19.5% were sentenced to "probation only." *United

States Sentencing Commission, Interactive Data Analyzer,*

*https://ida.ussc.gov/analytics/saw.dll?Dashboard.* That means a total of 33.6% received

sentences that did not include prison time.  While there is a disparity between sentences imposed

against citizens and non-citizens, the Sentencing Commission stated the disparity is because

"[n]on-citizens, as a practical matter, are ineligible for most alternatives because of their status as

deportable Aliens (resulting in immigration detainers that prevent their release into the

community). Aliens convicted of many types of federal offenses are subject to deportation from

the United States as 'aggravated felons.'" *See Moncrieffe v. Holder, 133 S.Ct. 1678, 1682* (2013)

(holding "if a noncitizen has been convicted of … crimes classified as 'aggravated felonies,' then

he is not only deportable, § 1227(a)(2)(A)(iii), but also ineligible for these discretionary forms of

relief. See §§ 1158(b)(2)(A)(ii), (B)(i); §§ 1229b(a)(3), (b)(1)(C).  Saaem is a permanent resident

of the United States and there is no immigration detainer or proceeding underway that will

render him ineligible for a prison-alternative sentence.

### D.    APPLICATION OF THE 18 U.S.C. § 3553(A) SENTENCING FACTORS

In arriving at a fair and just sentence, the Court is required to consider the statutory

factors under 18 U.S.C. § 3553(a) and may also consider other factors relevant to her sentencing.

#### 1.  History and Characteristics of Ishtiaq Saaem

##### a.   Childhood and Family Life

Saaem was born in Dhaka, Bangladesh on May 11, 1983, to Abul Mansur Shaukat Ali

and Kishwar Jahan Sayeeda Banu. He is the youngest of four children, and his parents' only son.

His sisters are much older than he; his nearest sister is five years older. They were a very close-

knit family during Saaem's childhood and being much older, his sisters participated in and influenced his upbringing. Saaem's mother came to Bangladesh shortly after its partition from India and as such, she tended to dismiss the importance of national borders, rather adopting an expansive worldview that she instilled in her children by exposing them to a wide variety of cultural influences in music, literature, films and television. In describing his parents' collection of vinyl records, for example, Saaem reports that you would find Michael Jackson and the Beatles right alongside the albums of the famous Bangla poet and musical artist, Tagore. It was important to his parents that Saaem and his sisters be "citizens of the world," and in fact, his mother took him on his first international trip at the age of three and a half, when the two traveled to London. A large portion of his extended family, on both sides, have settled in many different places around the world.

In keeping with their expansive worldview, Saaem's parents were comfortable with his childhood preoccupation with all things American. He was an avid fan of American comic books, films and television shows. Saaem's favorite American television show was MacGyver, in which, over and over again, the protagonist action-hero finds himself in an insurmountable predicament and manages to extricate himself using a compelling combination of ingenuity, resourcefulness and foundational scientific knowledge. The premise of this program perfectly encapsulates Saaem's intellectual make-up. He is—to a fault—an impulsively curious person, a trait which was robustly encouraged by his parents. To wit, one of the family's favorite photos of Saaem shows him at age 4, proudly surrounded by the internal workings of his father's record turntable which he was encouraged to dismantle in order to better understand why a certain part had stopped working. His sister remembers him digging up the garden plants and taking apart the

13

flowers to examine their insides and learn about their patterns, shapes and smells. *See* Letter of

Tazin Samina, Exhibit B-1. On one notable occasion, he nearly set the house on fire out of his

curiosity about matches. Wanting to understand the reaction that occurs when one strikes a

match, he harvested the calcium carbonate from the ends of several matchsticks and collected it

in a plastic plate to which he then attached a long wick. He placed the plate in the mudroom of

the family home – inside the house – and then endeavored to ignite the pile of calcium carbonate

using the wick he created. Fortunately, the powder was slightly damp and failed to ignite before

he was discovered by his mother. Upon making this discovery, however, his mother, instead of

subjecting him to bear the brunt of her alarm, let the episode pass with only a verbal

admonishment. In Saaem's mind, the unwritten message of that event may have been that you

can follow your curiosity as far as it will take you and that there really is no consequence or

downside to doing so.

       b.  <u>Education</u>

On other occasions, following his curiosity was richly rewarding to Saaem. His parents

deeply stressed the importance of learning and academics throughout his life and so, at age 11,

he and his close friend, Asif Zahir, easily convinced their parents to allow them to spend a year

taking extra lessons in computer science which would prepare them to sit for O-level

examinations at the age of twelve (roughly four years earlier than typical students). They both

successfully passed the O-level exam in computer science at that age. *See* Letter of Asif Zahir,

December 22, 2021, Exhibit B-2. The catholic school he was attending at the time only had one

computer in the building which was not accessible for students. However, Saaem's sister, who

was then seventeen and getting ready to depart for the US for her undergraduate education,

persuaded Saaem to take a tour at the American Embassy school, where he was dazzled to

discover a room full of computers for the students to use. Soon after, Saaem was admitted, and

began attending the Embassy school, where he continued his education both in academics and in

western culture. Saaem reports that in his home it was "a given," that he would pursue his

education in the west, as his sisters had done. So, from the Embassy school, he finally set off to

America and The Stevens Institute. After one semester, Saaem was ushered into the Scholars'

Program, through which he ultimately earned his bachelor's and master's degrees in Computer

Engineering in five years' time. It was during his time at Stevens that a trend began to emerge in

his social relationships. That trend, you will notice as you read through the many letters of

support submitted herewith, is Saaem's habit of befriending classmates and colleagues and

nurturing those relationships by showing up for the important people in his life; showing up with

encouragement, a listening ear, a helping hand, or a literal blowhorn of congratulations (*See*

Letter of Jeremy Nirmal, Exhibit B-3). *See also* Letter of Tom Scaria, Exhibit B-4.

Not content to confine his studies to computer science, Saaem continued his journey of

curiosity at Duke University, where he spent another five years earning a PhD in Biomedical

Engineering. Here again, at Duke, Saaem went on to develop close and meaningful relationships.

In a close-knit community of classmates and friends, Saaem was regarded as a peaceful, helpful

and trustworthy friend and a reliable and tenacious colleague. *See* Letter of Laura Johnson,

Exhibit B-5, and Letter of Jessi Bardill, Exhibit B-6. Upon completing his PhD, Saaem went

right into a professional position working in the field of synthetic biology. Following his

departure from that position, he went on to a position at the world-renown Massachusetts

Institute of Technology. Again, driven by his curiosity and passion for learning, during his tenure

at MIT, Saaem entered the Executive MBA program at Northwestern University, earning his

MBA in 2020. Here again, Saaem earned the respect and admiration of his classmates and was

appreciated as a thoughtful friend and reliable professional colleague and teammate. *See* Letter

of Christine Wachman, Exhibit B-7, and Letter of Brad Hilton, Exhibit B-8.

      c.  <u>Personal Life</u>

Through the ordeal of the instant case, Saaem's wife, Nabila Noor ("Nabila") has

remained steadfastly at his side. Saaem and Nabila and have been married for eleven years. They

met at Duke University in 2007, when Saaem was a second-year graduate student and Nabila

was a first-year medical student. Though she was reluctant to go out with Saaem at first, they

became friends and Saaem ultimately won her over by showing up at her door with bags full of

home-cooked meals he had prepared for her in response to her expressed boredom with the

quick-and-easy microwave meals she was accustomed to because of her demanding schedule.

During their dating years, an activity they shared was volunteering with the BOOST program at

Duke in which they mentored underprivileged sixth graders in the Raleigh-Durham area. Saaem

and Nabila were each assigned a group of three boys, and they often took all six boys on outings

together to the science museum, concerts and meals. They married in 2011, around the time they

were both graduating from Duke.

This case presents several challenges for them, to be sure, but this is not the first time

they have faced adversity together. Their demanding careers resulted in multiple periods apart,

first from 2011 to 2015, when Nabila was pursuing her medical training in New York and then

again, in 2018, when she accepted a job in Allentown, Pennsylvania, while Saaem was still

employed here in Cambridge. It was during this time, on January 8, 2019, that Nabila delivered their first child, Ayaaz, who arrived more than three months prematurely. Ayaaz spent 116 days in the NICU and came home at last, dependent on oxygen and requiring frequent bottle feedings. It was then that Saaem took leave under the Family Medical Leave Act and moved from Boston to Pennsylvania to be with his family and care for Ayaaz. Nabila returned to work full time as a physician and Saaem was able to arrange remote working with his employer and so he worked from home and took care of Ayaaz as well. Eventually, in April 2021, Saaem was asked to resign from his job due to this case. He now devotes his time to caring for Ayaaz, who is in the care of several doctors to address persistent health problems resulting from his severely premature birth. Because Saaem is not able to contribute much financially to the family, Nabila is the primary breadwinner for the family, carrying a very demanding schedule, featuring a full load of patients, and thrice-weekly surgeries.

To develop an opportunity for Saaem to contribute to the family's financial well-being, Saaem and Nabila have invested in some rental properties in the area where they live. In addition to caring for their son, Saaem keeps up the properties and tends to their tenants' needs. Saaem and Nabila view this arrangement as the only available option for Saaem in terms of employment because his career as a scientist has been essentially ruined by this case and the publicity surrounding it. The loss of his career and the mental anguish Saaem is experiencing as a result of this case is crushing. To rehabilitate his emotional and psychological well-being and to restore his ability to be a supportive father and husband, Saaem has engaged the help of a clinical psychologist. It is Saaem's hope that this therapeutic support will help him to better understand

17

himself and his situation and help him develop the coping skills he needs to contribute his full attention to his family and his community.

Saaem hopes to continue in his role of provider and caretaker for his children. His family has suffered tremendously throughout this judicial process, and it is their sincerest wish that the Court will find that an alternative sentence, including a period of home confinement and a period of probation with community confinement, is appropriate for the reasons stated below, and to allow Saaem to continue caring for their young children and contributing to his family.

     2.   **The Need for a Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public from Further Crimes**

         a.  <u>Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Afford Adequate Deterrence to Criminal Conduct</u>

A period of 6 months home confinement followed by one year of probation with community confinement would provide sufficient punishment for the crime and reflects the seriousness of the offense. The fact remains that this is a case of a scientist who lied about his misplaced curiosity. There is no evidence whatsoever that he took any further steps than acquiring 8 seeds and plants from which a poison can be extracted. He did not take any step to extract poison. He did not possess ricin or any other poison. The actual criminal conduct is giving false statements regarding the initial purpose of obtaining the castor beans and lily of the valley plant.

The effect of this federal prosecution by itself has served the purpose of promoting respect for the law. The consequences Saaem has suffered are widely known in his scientific community. His loss of employment as a result of this prosecution is public knowledge. The

18

harm to his reputation, employability, future career as a scientist is also widely known. For a scientist, these consequences are probably more costly than a term of imprisonment after which one can quietly return to practice in his or her field. In many ways, the prosecution itself has achieved the goal of promoting respect for the law.

b.   <u>To Protect the Public from Further Crimes of the Defendant</u>

Saaem is not likely to reoffend. To determine the likelihood of Saaem's recidivism, it's proper for the Court to consult "*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*," a report issued by the United States Sentencing Commission. *See* <u>United States v. Nellum</u>, 2005 WL 300073 at *3 (N.D. Ind. Feb 3, 2005) (*http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal _History.pdf*). In its report, the Sentencing Commission identified several factors that affect recidivism including age, employment status, and educational attainment. The report, which was the first comprehensive study and report of the Sentencing Commission on recidivism found as follows:

> Age at Sentence: "Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates. Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent."

> Employment Status: Offender "with stable employment in the year prior to their instant offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%). The difference between the employed and unemployed recidivating declines in the higher CHCs, until offenders in CHC VI have virtually the same recidivism rate regardless of their employment status in the year prior to their instant offense.

> Educational Attainment: "recidivism rates for offenders with different educational backgrounds. Overall, offenders with less than a high school education are most likely to recidivate (31.4%), followed by offenders with a high school education (19.3%),

19

offenders with some college education (18.0%), and offenders with college degrees (8.8%)."

Saaem is 39 years of age, which places him close to the lowest category. He had stable employment in the years prior to the charge in this case and has attained advanced college degrees in various fields.

In addition to the Sentencing Commission's recidivism report referenced in <u>Nellum</u>, the Sentencing Commission issued a report entitled "*Recidivism and the First Offender*" available at: *http://www.ussc.gov/Research_Publications/Recidivism/200405_Recidivism_First_Offender.pdf*. In that report, the Sentencing Commission determined that **93.2%** of offenders who had never been arrested did *not* recidivate. *Id.* A defendant's lack of criminal history, as in Saaem's case, should therefore be an even more significant factor that a court considers at sentencing.  Saaem has zero criminal history points. The Sentencing Commission's recidivism study established that offenders with zero criminal history points have a lower recidivism rate than offenders with one criminal history point, and that offenders with zero criminal history points and no prior contact with the criminal justice system have an even lower recidivism rate. *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6–9 (2017). (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research publications/2017/20170309_Recidivism-CH.pdf).

Finally, Saaem meets the definition of a "non-violent first offender," under the new amendment to the Sentencing Guideline.  The new application note defines a "non-violent first offender" as a defendant who (1) has no prior convictions or other comparable judicial

dispositions of any kind; and (2) did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense." Saaem meets this criteria and, by all measures, poses the very minimal risk of reoffending.

### 3. The Need to Avoid Unwarranted Disparities

Imposing a more severe sentence than home confinement and probation in this case would result in an unwarranted disparity in treatment of defendants in similar cases. Judges in recent cases have imposed alternative sentences in cases involving defendants who were found guilty of making false statements to law enforcement. *See* United States v. Chen, 998 F.3d 1 (1st Cir. 2021), United States v. Harris, No. 13-10228-FDS, 2016 WL 2626855 (D. Mass. May 6, 2016), United States v. Rivera-Ortiz, 14 F.4th 91 (1st Cir. 2021), United States v. DeFilippo, 795 F. App'x 3 (2d Cir. 2019). Notwithstanding Saaem's guilty plea to the charge of obstruction of justice, the facts of this case indicate that Saaem's conduct would more accurately be viewed as making false statements. The only conduct at issue is Saaem's failure to be fully truthful and forthcoming to federal agents in response to questioning regarding his acquisition of castor beans and lilies of the valley. There is no underlying offense in this case, as there was in Chen, where the defendant was charged with insider trading but only found guilty of making false statements. 998 F.3d 1 (1st Cir. 2021). There is no indication within the facts of this case that Saaem had an underlying intent to deceive or defraud a government entity in addition to the false statements made to law enforcement as there was in DeFilippo, 795 F. App'x 3 (2d Cir. 2019), in which the defendant submitted a forged document to falsely represent himself as an active-duty police officer and then lied about it to federal agents. Nor is there any indication within the facts of this case that Saaem took any affirmative steps to otherwise thwart any of the government's

21

investigative activity, which would seem to enhance the severity of his actual conduct, which was simply making false statements out of a sense of fear and panic in his dealings with federal officers. Declining to impose the alternative sentence of probation in this case would lead to an unwarranted disparity in sentencing among similar cases.

### 4.   The Need to Provide Restitution to Any Victims Of the Offense

This case does not involve restitution.

### E.   OTHER FACTORS

#### 1.   Saaem has Already Suffered Significant and Unique Harm

Unlike the overwhelming majority of defendants facing a federal charge, Saaem has already faced drastic consequences because of being charged in this case. Because of the way his case was reported in the media, Saaem was forced to lose his very successful and productive employment. His reputation is irreparably tarnished. Financial institutions with which he had long-term banking relationships terminated his accounts following reports of this federal charge.

He has suffered significant loss of income and, in some cases, he lost many colleagues and even friends. The drastically negative impact on his ability to obtain employment in his field will continue for the foreseeable future.

#### 2.   Incarceration is More Significant for a "First Offender" than Upon a Repeat Offender

The Court can, and should, consider the fact that prison time is more significant for a "first offender" than it is upon a repeat offender who has previously served time in prison. This is a proper factor to consider under 18 U.S.C. § 3553(a). In <u>United States v. Baker</u>, 445 F.3d 987 (7th Cir. 2006), the Court held that a 78-month prison term would mean more to Baker, convicted

22

of child pornography, than to a defendant who had been previously imprisoned. *Id.* The Seventh

Circuit also noted this factor is consistent with 18 U.S.C. § 3553's directive that this sentence

reflects the need for "just punishment" and "adequate deterrence." *Id.*

In United States v. Willis, 479 F.Supp.2d 927 (E.D.Wis. 2007), the district court

sentenced Willis to one year and one day of imprisonment instead of the 120 months

recommended by the sentencing guidelines, in part, on a finding that the "sentence provided a

substantial punishment for someone like [Willis], who had never before been to jail and who

engaged in no violence." Willis, 479 F. Supp. 2d at 937. Likewise, in United States v. McGee,

479 F. Supp. 2d 910 (E.D. Wis. 2007), the district court imposed a sentence for heroin

distribution below the advisory Guidelines range, in part, because McGee "had never before

been to prison and '[g]enerally a lesser period of imprisonment is required to deter a defendant

not previously subject to lengthy incarceration than it is necessary to deter the defendant who has

already served serious time yet continues to re-offend.'" McGee, 479 F. Supp. 2d at 912 (*quoting*

United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005)).

Saaem asks this Court to consider that he has *never* been imprisoned for any length of

time. Given his background, the non-violent nature of his offense, the overall circumstance of the

criminal conduct, his age, educational background, employment record, family status, and lack

of any prior involvement in the criminal justice system, a sentence of 6 months home

confinement, followed by one year of probation with community confinement, is sufficient but

not greater than necessary to achieve the goals of sentencing.

**F.     CONCLUSION**

 Saaem respectfully submits that the application of each of the factors enumerated in 18 U.S.C. § 3553(a), including the specific offence conduct, Saaem's background and history, the need for deterrence, the prospect of recidivism, the impact on innocent third parties, and the direction of Congress to avoid sentencing disparities with similarly situated defendants supports a sentence of 6 months home confinement followed by one year of probation with condition of community confinement.

ISHTIAQ SAAEM
By his counsel

/s/ *Derege B. Demissie*
DEREGE B. DEMISSIE
DEMISSIE & CHURCH
929 Massachusetts Ave., Suite 101
Cambridge, MA 02139
Ph: (617) 354-3944
dd@demissiechurch.com

March 28, 2022

**CERTIFICATE OF SERVICE**

 I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 28, 2022.

/s/ *Derege B. Demissie*
DEREGE B. DEMISSIE